Good morning, everyone. Make sure you speak clearly because our third member of the panel is not able to be here today. We will be conversing with her and she will be reviewing the oral argument. Mr. Hildebrand. May it please the court. Good morning. I'm Jack Hildebrand. I'm representing the defendant in this case, Mr. William Muth. Because the big issue in this case concerns the statement, the videotape statement, I'd like to first start off with making a few comments just about the circumstances surrounding that statement. First, you know, what did the expert witnesses say about conducting an interview like this? Lori Ream said that if the child denies an allegation of abuse, the interviewer is not supposed to challenge the child on that. And Dr. Regala said that if you keep asking the child the question over and over again, the child would want to give an answer that they think the adult is looking for because they want to please the adult. Well, but in this case, the child stuck with her answer until he changed, maybe not the particular question, but he went to a different issue. He went to the anatomically correct pictures. Is that pushing or is that leading the child? Yes, because the child said, I don't know. I don't know. Repeatedly over and over. And he challenged her on that. And he kept saying this. She said, I don't know. Was it a body part? Was it something you brought in? I don't know. I don't know. Was it this? Was it that? And finally, he said, yes, you do know. And so he's basically challenging her. Is your argument that the trial court didn't give sufficient weight to the technique that was used in determining that the statement was reliable? Yes, the trial court should have never allowed this in because it's the product of suggestive questioning. And that's a real problem in these types of cases because once that allegation is made in a forensic interview, that statement is going to come into evidence as long as the child appears and speaks, just like if we follow the procedure that was used in this case. And all the evidence in a case like this that is typically and historically been viewed as evidence that would exonerate a defendant in a case like this, at the trial, that evidence will not be used as evidence of exoneration, but it's going to be turned around. And it's going to be used as evidence of guilt through the testimony of an expert in child sex abuse syndrome, accommodation syndrome. In other words, if the child comes in and says, okay, the defendant did not do this. I told the investigator that he did it because I was angry at my parents or the defendant, whoever it is. And that's why I said it, but nothing happened. Then the expert will come in and say, well, this is consistent with sex abuse. This is how children react when we can't. Or they will try to protect the abuser, especially if the abuser is a loved one or the loved one is taken away from the home. They will try to protect the abuser. Here the expert didn't specifically discuss the details of this particular statement, though. She gave just a general overview of the way children react, correct? Yes. And she, did she either test, either Dr. Regula and Ms. Rehm, did either one of them say that they should stop questioning, there should be no questioning if the child doesn't respond as expected? The testimony they gave was basically what I just said. I don't recall them getting further into it, but they just said you should have challenged the child. And during that testimony, the impression that I received from this is that you're supposed to set up some, a really, an atmosphere that's free from any kind of pressure just to create an atmosphere for the child to start divulging on their own. Those are recommendations. They are not evidentiary guidelines for the admissibility of the statement, correct? I believe that, that's probably correct, but I believe the cases say that if there's suggestion, it doesn't come in. Okay, so you have a case that says if there's suggestion, it doesn't come in? Sure. People versus miles and people versus where. Any suggestion at all? No, I think leading questions are. What you're saying is that if the statement is a product of suggestion or suggestibility, then the statement can't come in. Yes, it's for the court to decide. It's not just a mere question or a few questions. It has to be the overall viewing the entirety of the statement, whether or not it's a product of suggestion, correct? Yes. I think it's for the court to decide whether if there was suggestion, if it crossed over the bounds. It's an improper suggestion. And the standard here is abuse of discretion? Yes. Okay. So, you know, because once a statement is made, it's going to come in and the traditional forms of defense are going to be negated by an expert. I think that makes it even that much more important that courts really protect and make sure that when these statements come in, they're not the product of improper suggestion. And in this case, it was more like an interrogation than it was an interview. He basically just would not allow her to deny it. And that's what children will do. They keep repeating over and over what, what, what, and then finally says yes. It says you do know. Well, when you say that's what children will do, I mean, where is this coming from? I mean, we all have children. That would be Dr. Angala. If you keep repeating the questions, the child will want to give the answer that they think that the adult is searching for to please the adult. But if you actually, and I did look at the transcript and I looked at the, the, the order of the questions, they didn't, he didn't keep using the same question. He would change the question, although he did keep questioning the child. So he didn't keep saying, he didn't say, you know, at first, or, you know, he said, was there something in the, in the room? I don't know. Was there something that he brought with? I don't know. Was there something on his body? I don't know. So he kept changing the question. Where did, and again, I go back to Dr. Ragugu, where does he say that he must stop if she doesn't answer or if she doesn't provide an answer in this, this first phase of the investigation? Right. That's what the judge is supposed to decide. And even though he may have changed it up, he was like totally ignoring every time that she denied it. And if it wasn't leading, then how come he was able to get her to identify the penis and then say, have you ever seen his penis? No. That's right in the interview, right in the interview. And it seems to me that leading questions are okay as long as they're used to clarify a point, not to elicit a statement. And why isn't he, why isn't he clarifying things? Why doesn't he clarify, well, if you've never seen it, then he should have gone into what he was doing before. Well, then how do you know? You know, because he would challenge her, like, I don't know. Well, you told me he was cleaning with you, so you have to know. Well, yeah, he was cleaning. Well, then you have to know what, what it was when he, you know, you said, you know, he was cleaning with something. So you have to know that something was. With regard to what she knew, she gave a, she gave a pretty good, fairly graphic description of anal penetration without any suggestion at all. Are you referring to the pain? Yes. And also that she felt her bottom stretch. You're not suggesting that that was suggested, are you? I don't know what that suggests, because she also said that when she wiped herself, she felt pain because of her rashes. That's, she said pain. I'm not talking about that. Oh, she talked about when she felt a sensation on her bottom, she said she felt it stretch. I mean, that's consistent with cleaning a child also. And so, you know, when she makes statements like that, then if there is a need to. Cleaning a child in the middle of the night. Yes. That was a testimony that she would soil herself and would have to be cleaned. Let's get on to your next point. So the next big thing is obviously 115-10. And, you know, what is the purpose of that statute? And I believe what it is for is to help in prosecutions by allowing in evidence, which is normally not allowed in, in the form of prior consistent statements. The statute is very specific about what these statements have to be. They have to be actual allegations about the charged conduct, elements of the offense that's charged. And they have to be basically prior consistent statements. That's the purpose of the statute. And to have a prior consistent statement, you have to have more than one statement, right? The domestic violence victim who recants on the stand. It's similar to that. Yes. And so when you have a prior consistent statement that's going to be used to corroborate a child's version of something in this area under the statute. You have to have the child, if this is the only evidence that you have is a testimonial, here's a statement, and that's it. You just have the one. Then if you want to bring this statement in through the statute that allows prior consistent statements, then the child has to testify and has to accuse the defendant at trial. Then you can bring in all the prior consistent statements that you want. That's your, I think you're referencing LEARN there, correct? Yes. And I think that's all LEARN is doing is just following the statute, the intent of the statute, the purpose of the statute. What about NRA Brandon P, the recent case from the Illinois Supreme Court? The court did not mention or suggest that in order to be available to testify, the child must accuse. I think that the child must accuse only in the situation where this is the only statement you have is this hearsay testimonial statement. Well, you also have a hearsay non-testimonial statement to mom. Yes, and I believe in LEARN. So it's not the only evidence. And I believe in LEARN there was evidence like that, but they found that there was no collaboration for that, and so that wasn't allowed in even though. What about the uncontested testimony of mom that she overheard the defendant in the bedroom talking to the victim, talking to MM about her disclosure that she had made to mom, and then she comes down to mom and takes it back and says that I was lying? Yes, I mean that's... And that's corroboration, isn't it? It's corroboration that she said that, but what does that mean? I mean, does that... I'm not really sure what that means. I mean, does that mean daddy claimed me with his pee pee? He claimed my foot, my hand? I'm talking about the defendant, just the circumstance of the defendant taking the victim into a room after he learns of a disclosure to talk to her privately. That's not... you don't think that that is corroboration or evidence of a guilty mind? No, I mean, the mother testified she was standing right there. That was a family thing, that they agreed on it. That's how it was going to be handled. Yeah, mother was not in the room. The mother was not, right? The door apparently was either closed or was ajar. She couldn't hear everything, but she could overhear generally, and then she left. And shortly after that, the defendant comes down, and then the child comes down and said, mom, I lied. Well, if I recall correctly, I think it was the mother who suggested that the defendant speak to her because it was an allegation about him, and she wanted him to speak to her. Right, but there was nothing that would have prevented her from staying there. No, she certainly could have stayed there. It's her child. All right, let's go back to Leung. And I, of course, was on the Leung panel. Everybody knows that at this point. And we said it had to be something that related to the incident. It should be accusatory. Well, maybe that language is, it's never been said to be perfectly wrong by the Supreme Court anytime they've looked at it, but they have said that it does not necessarily have to be accusatory. It has to be about the offense or generally about the issue. And in this case, this girl testified. It didn't happen. It didn't happen. I don't know. I don't remember. It didn't happen. She talked about the allegations freely. I mean, she testified. She talked about her lying as a five-year-old. This was a problem for her or what she remembered, but she's now 11, and she was qualified as confident by one of the judges that she knew the difference and she could testify. So why are you saying that she was not, that she didn't, her appearance and her testimony did not comply with either Brandon P. or Leung? Well, this is only going to apply if we don't have any other evidence but this testimonial hearsay evidence. It's not like a prohibition on all things. And we're dealing with a child also. And I think that, I think Leung takes that into consideration. We're dealing with a child, and we're not dealing with a voluntary statement. Her mother didn't even want to bring her there. They're forced to bring the child there. The child's placed in a room. The child's denied access to an attorney, denied access to a parent, and then is subjected to this testimony. It's not like a voluntary statement of somebody on their own giving up this statement. Well, mother didn't want to take her there, but somebody reported this to the police. And it was a family member. It was mother. So she must have understood that there would be implications and maybe even complications by that particular report to the police, correct? She didn't think she was going to walk into the police and say, oh, by the way, my daughter said this. I just wanted to tell you, see you later. That's correct. So she knew that there would be follow-up. She had some idea there would be follow-up, and they cooperated in the follow-up, correct? That's correct. Now, the thing that might be interesting here is I think when the child was 11 and she's now testifying, she said that basically dad's been away for four years. What do you think of that particular statement, that she hasn't seen her dad in four years or something? I don't believe he was allowed to see her. Well, he couldn't see her, let's put it that way. But we're looking at it from her perspective, not his perspective. Correct. She doesn't necessarily know why. Because we're dealing with a child again, and if we're looking at it from her perspective, when she says, I don't remember the interview, I don't remember that, we're talking about, she's talking about abuse that allegedly occurred when she was like five, maybe six. She gave a statement when she was six. She's now being asked at 11. That's like a half a lifetime before. And the jury was aware of that. They were aware that she was 11, that the statement was at six, the actual allegation was made when she was probably halfway through her fifth year. She was getting close to six because I think it was about a six-month period before they actually talked with the girl after the report was made. So the trier of fact in this case had an opportunity to see that, didn't they? They saw all the evidence, yes, absolutely. But if we're talking about the Confrontation Clause, if we're not talking about 115-10, if we're talking simply about the Confrontation Clause, this rule is only going to apply when this is all you have. In fact, Learn is very narrow. And if you look at the other cases that kind of expand well, if there was an opportunity to cross about something, those are all a little bit different, including the case that you cited in Learn. I think that one was People v. Sharp, where there it's almost like the defendant waived his right to confrontation because he didn't cross at all. And that witness, she didn't say she didn't remember. She didn't say it didn't happen. She just remained mute. And nobody said, well, Your Honor, will you please have the witness answer the question? So that was available to be crossed out. All right. But isn't that the point of these particular cases and including Brandon P's analysis? Each one of these cases has to be looked at independently. And if you find a case that's on all fours, you're probably going to get a prize for it because there is no such thing. Now, I know counsel's going to get up and say that Learn is bad, Learn should go away. I mean, I know that argument. I've heard it from that side before. But the point is, each one of these cases has to be looked at individually. And Learn may attach itself, but that's only because it's attaching in the part you want. Brandon P, the latest, seems to, I don't want to say smooth things out, but seems to be a pretty good analysis of what available and unavailable is. And in this case, she's unavailable because she testified on direct that she did not recall the interview, did not recall seeing those sheets of paper before, so there was nothing for him to cross out. And isn't that an issue of credibility as well as availability? Yes. She's not accepting the stipulation on appeal that the child was unavailable. And the court in In re Brandon P did not discuss your proposed Learn analysis that the child must accuse. They talked about fear, competency, inability to communicate in a courtroom setting. Never discussed this. So along with Justice Hutchinson's remarks, Learn was fact specific and maybe that broad language that the court used in describing this holding doesn't apply to unless that particular situation is actually there. It's a competency issue, not in terms of unavailability. Here, the child is answering every question put to her. That's not the case in Learn. Right. And if that is going to be the rule, then… Well, that's what the Supreme Court said. You have to follow the Supreme Court. If that is the rule, then I would say that we really have to look at the statement then to make absolutely sure it's free from any kind of suggestion, because that's going to come in and that's going to be used, whether or not the child has any idea of what's going on. And like I said before, if the statement is going to come in, we know that it's going to come in as long as the child appears and answers questions. And if the defense is going to be negated by an expert, then the chances for conviction are going to be very, very high, regardless if that statement is true or not, if the allegation against the defendant was true or not. So we have to make sure that there is no suggestion in these statements. All right, Mr. Hildebrand, your time is up. Do you want to summarize or do you have time for rebuttal? Okay, thank you. Thank you. Ms. Kripke? May it please the Court, General Kripke, on behalf of the people of the State of Illinois Council, which issue would you like me to address first? It's your argument. All right. I just have to say in regards to the reasonable doubt, to reiterate what we said in our brief, and that's that this Court must look at all of the evidence that it cannot take out that the evidence the defendant is saying was not allowed in, or was allowed into evidence and was an abuse of discretion. And so that's the standard there. What about the argument that counsel just made, given the clear suggestive questioning in the statement that we should pay particular attention to the trial court's finding of reliability in light of the fact that if Inmate Brandon P., what the court says about fear, competency, et cetera, applies, that we have to be even more cautious about allowing 115 tenths statements in? Well, first of all, I don't think that the questioning was suggestive. The defendant, as I pointed out in our brief, strung together with ellipses, various questions that he thought were harping on the child to yes, I think you know. And when I looked at that, I spent a lot of time with that DVD. I don't have my brief in front of me, but I went through it, and from the first statement, the first question that he found to be suggestive to the last, 43 minutes, 43 minutes plus elapsed. And each time, and one time it was 19 minutes in between questions, one time it was 11 minutes in between that quote-unquote suggestive question, one time it was five minutes. So it wasn't like he said, I think you know. She said, well, I don't remember. I think you know. I think you ought to tell me. It wasn't like that until he, you know. That's true. It wasn't. This interview didn't take place in the time that those particular questions could be asked. It was over an hour. It was over a period of time. Correct. But the fact remains, he did say, I do, I think you know. And he actually did say, you know, tried to help her with the anatomical part at one point. But there's nothing, well, I'm hoping that the court watched the DVD because important to it all is the tone of voice, the comfort level of the child, whether this man was looming over her, whether he was crowding her, whether he was pushing her. But he pulled out these anatomical, and I don't think there's anything anybody's ever said you can't use anatomical pictures. They're used all the time. They're used all the time. So he pulled out a picture. And the first thing he said was, whoa, is this it? Is this the body part? No. He said, what is this a picture of? He asked her to identify it. And she said, it's a man. He said, well, how do you know it's a man? And the first thing she pointed to, it looked to me like she was pointing at the hairdo and saying, well, because of that. And she said, and because of that. And then it looks to me like she's pointing at the penis. And then she went, you have to listen to the tone of voice. And that's the thing that I was talking about. It's like the aha moment for this child. She did not have the vocabulary. And that was corroborated by the mother. They never used the word penis in their home. They used pee-pee, and it was a general term for male and female. This child did not have the vocabulary to express what was going on. And did she use, and just what you said there, that's the thing I was talking about? Or did he use the word the thing first? I have to look back. I quoted directly from the transcript. But she said, that's what I was talking about, the thing. And before that, she said, well, he uses something. And she gave this description of what a penis looked like to her from what she'd seen with her brother. And then she went through this, except for the sad fact that this is a very charming analysis. She said, well, my brother's got one, and my dad's got one, and I'm in between them in age. I don't have one, so I guess I'm not going to get one. And my mom doesn't have one, so I guess only boys have it. I mean, she simply did not know. I mean, she was that naive at that point in time. Well, except, you know, she is doing what other children do at that age. And when there's more than one in the family, we take the group bath. And she's taking a bath with at least one brother. Right. And so, you know, she is aware of the different physiological features. Correct. But she really doesn't know what to call them. Correct. Other than what the family calls them in their own preference. Correct. But when you look at the four factors of reliability that have gone over in Bowling, the spontaneity and the consistent repetition of statements, she consistently said, I don't know what it is. I mean, I don't think she was saying, I don't know. She just didn't know how to articulate it. We also don't know how many times this occurred either, do we? No. No, we only know that it happened more than once. Correct. I would argue that in terms of the sexual abuse, that the language is clear that it happened at least twice. As to the other ones, I believe that we proved up all six of the other sexual assaults. The jury was instructed very clearly, and Kathleen Colton specifically asked the court to read off the verdict forms, guilty, not guilty, for each one of the counts. So 16 guilty, not guilty, were read out. The state repeated in its closing argument, we don't have to prove a date. And they didn't. They also argued that it happens almost every day of the week. No, they said that the father came into her room, and the father testified that I came in every night to check with them. And he said, and I would check their, quote, unquote, drawers, their underwear, two to three times a week. In his closing argument, which you quote in the brief, the state argued that he committed these acts, quote, unquote, almost every day of the week. Almost every day of the week. Right. But there's no evidence to support that it happened almost every day of the week. In fact, the child said it didn't happen all the time. Not all the time. Correct. But he also didn't say every day. How could we allow more than two counts to stand on any one of these allegations when we don't have any specific evidence to point to that it happened more than twice? Well, part of it is that twice on each one. Right. So that's six altogether. So you're saying what the first one is. My question is, proof beyond a reasonable doubt of more than two for each act. Because the jury is allowed to, A, as they were instructed, use their common sense, and, B, look at circumstantial evidence. And the circumstantial evidence of their common sense is this man was accused of coming from a period of time, the span of dates is 303 days. He's a ritualistic abuser. That would be essentially correct. A ritualistic? Right. Okay. Continuous. Serial. Continuous. I believe that that is true. I think that this man, because the child also said the last time that it happened was January of 2007. When I hear that language, it implies to me that there was another time before that that happened at least once. And she identified one that she did not identify to her mother. I'm sorry. She identified to her mother. Another time back when the first time in the car. That was the one we started with. Correct. And then when she gets into questioning about six months later with this investigator at the child advocacy, she does talk about an anal possibly penetration or a touching or something that occurs that she said hurt. But those are the only two specifics we have, correct? And she also, no, because the investigator also said to her, is this what he uses to touch where you go pee and where you go poo, to quote the people. And she said, uh-huh. And you have to look at her, and she's nodding her head up and down in assent to that. And sometimes means more than once. It's at least twice. And then you have these two specifics that are going on. But you asked also how the jury can find this beyond a reasonable doubt. Not only are they allowed to use their common sense, but they're also allowed to look at circumstantial evidence. The circumstantial evidence was that the father admitted coming into the room every night to check on the kids. He pulled the pajama bottoms down or the diaper down on the other children, he was saying, two to three times a week. And there's something else. The little girl said, well, sometimes he would pull my nightgown out and then pull my underwear down. Or he would pull down my pajama bottoms and then he would pull my underwear down. And the father testified she either wore a nightgown in the summer or she wore pajamas in the winter. And her testimony was not just that he pulled her underwear down, et cetera. He got in bed with her, correct? Did he get in bed with her? Did she testify he actually got in bed with her? I think I, you know, I thought I had Xeroxed it, and I could not find my copy of the transcription. I have some vague recollection that there was something to that effect. If you saw it, then fine, I will agree to it. I don't think it was, to me it wasn't that clear, but it implied it. The other thing that I think was circumstantial evidence on which the jury could rely was the fact that the father admitted that the doctor, Dr. Slavik, had never ever said, yeah, wake the kid up in the middle of the night and check their underwear or whatever to see if they're wet. They didn't say, and if the father's going in every night of the week waking a kid up or even two to three times a night, parents just don't do that. Well, mother said that she had done it too, but the daughter said that, well, mom goes to bed earlier and dad stays up later. No, the mother never said she woke, she testified that she never went in and woke the child up. She would come in to clean the child up once the child came to her and said I had wet the bed. And the mother said she was instructed by the doctor to use her finger to insert, say, into the child's, I don't know, into the rectum, into the vagina, I don't know what, inside the child's orifice, but the mother said I never did it in the middle of the night. She said that, but so somebody's inserting something in this child in the middle of the night, and she said it, and mom did not come in and do that. I think that the jury had enough there to reasonably conclude that over 303 days that this child was being sexually assaulted by her father, and it happened at least these eight times, or six and eight, six and two, at a minimum, and that this actually was, you know, this was a gift. And when you go back and look at the testimony of Dr. Slavin, he said that this child came in at age four and somebody, well, the father said he really didn't take the child in for physicals. It was probably the mother, and he was working, I think. Somebody came in and said, because he had it in his notes, the child has manifestations of masturbation at age four, and she probably had some kind of a vaginal infection at age four. They were allowed to consider that and think we didn't even charge him with something going on at age four. So that's all part of that evidence. One of the things that I want to, I do want to talk about the 115-10 admission and the learn case. The purpose of 115-10 is to allow in testimony that a child that is sexually abused makes an accusatory statement out of court close to the time when the incident or the incidents occurred. The accusation has to come in an out-of-state statement. That's what makes something subject to 115-10. Otherwise, it's just a hearsay statement, and it's not, and it doesn't come in. And the court has to look at the statement for the four reliability factors. I'm not, and we've discussed that, or we can discuss it more. But once the reliability is established, in this particular case, what was required, because we didn't have any other corroborating evidence, was that the child be, come in the court and testify. Learn reads into the statute language that simply is that not there. Learn reads into the statute that the child needs to come in and accuse. No, the accusation has to come in the out-of-state, out-of-court statement. The 115-10 does not require an accusation. It just requires testimony. And when you look at testimony about what? The sky is blue? No. It has to be, so we looked at what Crawford, and she has to be available to testify. And so let's look at what Crawford said. Crawford also does not require an accusation. Crawford requires the person to be, the accuser, to be available to testify on cross-examination. So what this child did or did not say on direct is technically irrelevant in terms of the availability of the child. But cross-examination is generally, although with children it is often expanded, is generally related to what the direct testimony was. Okay, so in this case, so availability under Crawford is you have to come in and explain or defend the statement that you made out-of-court. She explained it. She came in and said, I don't remember. And all the case law says, gaps in memory does not mean that the person is not available. If that were the standard, if the person came in and said, I don't remember, practically all the gang testimony and everything else we've ever looked at, nobody would be testifying to anything. People simply don't remember. And a child that's been traumatized certainly doesn't remember if you look at what Lori Reen was saying. The rule also contemplates the use of 11510 statements and other hearsay rules where there's testimonial hearsay, contemplates impeachment. Right, and they impeached her. She came in on cross and she gave them exactly what they needed. I am a liar. I lied. So now, so they have this accusatory statement that the jury's allowed to look at. And now you have her up on the stand saying, yeah, I lie. I go to a counselor. I filled in the blank and all these things. What's my worst problem? A, lying. She admitted in the videotape, yeah, I lie. I lie to my dad. I mean, I lie to my mom. She said it on the stand. She said, yeah, I have a problem with lying. But I think she had a problem lying when she was younger. Well, that's what she said. Right. She doesn't cop to lying when she's 10 and 11. She said this was a useful indiscretion. I'm using bigger words than she knew, but this was a problem then. Well, and also you have mom accusing her of being a liar. You have the father saying kids lie all the time. She's just a liar liar and we can never get the truth out. I mean, it was incredible. The father was accusing her of lying all the time. He said practically since she began to speak, this child was lying. So the credibility of the child was certainly put out there. And that was available to the jury. The issue then becomes the credibility of the witness with the statement she's making in court. She didn't break down like the child in Learn. And, yes, we've made arguments about Learn. I think Learn, to the extent that it deals with the competency of a child, that's what Learn is all about, that this court should continue to back away from it when it talks about availability of a child witness under 115-10. We think that Learn has read into the statute and read into Crawford a requirement that simply is not there, and that is the child does not have to come in and say, this is the person who did this and this is what he did to me. Wouldn't the availability include the ability to test the credibility of the witness, which didn't happen in Learn, didn't happen in Brandon P? I mean, he couldn't. And they had that here. They were able to test this child's credibility. Well, isn't that really the issue here? Yes. Crawford sets up this standard but says we're looking for somebody to be able to test that credibility and for that to be done, the child has to be available to explain or defend her statements. And her explanation was, I don't remember and I'm a liar. And that's for the jury then to make a decision. And that was part of Lori Ring's testimony, which was properly admitted. I just want to make one brief reference to the fact that in Atherton, in Simpkins, the reason that the percentage was not allowed, they didn't come out and say no, percentages can't use percentages in Atherton. Atherton was pointing to Simpkins and saying he made a comment directly about the credibility of the witness. And so there's a big difference. And I just wanted to ask one other question because your time goes up. The video is pretty compelling. It's probably more compelling than her testimony. It's more compelling than Mom's testimony. It's a little girl struggling. Just because she's been available for cross-examination, should everything of that nature come in? Yes. And why? Is it more prejudicial than probative? Should parts of it have been redacted? Or do we get the whole thing? You get the whole thing because the courts, first of all, were constantly, I believe it was at CH, where they said, look, we're not going to, and they've gone after the state in certain cases, saying we told you get a videotape in here, get a verbatim recording. So who's going to edit it? Who's going to say what comes in and what doesn't come in? And you need that continuity. You can't do what the defense did in this case, was put in ellipses and say, look, he was haranguing this child when it was over a 45-minute period. And I'd like to. All right. Maybe let's do a final because. Okay. May I just make one comment about what was said in the reply brief about what I believe, which I took umbrage with. In the defendant's brief, they said that Mr. Berg had failed to give this child an opportunity to come in and tell her story. And what I said was, well, this child didn't even know why she was there. I mean, she comes in, a strange man sits down, and he starts talking to her. And I said, therefore, you know, what's this little girl going to do? Dave, let me tell you about what Dad's been doing to me. She had no idea why she was there. They took that statement out of context for my brief, which is on page 56, and said that there was no, you know, that I agree that there was no reason why this child should ever be expected to condemn her father. And so for all the reasons that we've said here, we think, first of all, that the defendant was proven guilty beyond a reasonable doubt, that the 115-10 statement was properly allowed into evidence, that it met all the factors of reliability, and that the victim was available for cross-examination. We ask you to affirm the convictions and the sentences of this defendant. Thank you. Mr. Hillbrand. Thank you. I don't recall that, so my apologies to Ms. Kripke on that. It certainly wasn't intentional that I would have remembered it. But I thought Crawford was to test the reliability of the statement. Well, it goes to credibility. It's certainly part of the equation. It would be a part of it, yes. There are other issues of credibility, I mean, reliability, but credibility seems to be the one at the top. I can't think of another one to name that would come as close. So aren't we looking to test the credibility of the accuser? I believe that's all of it. And I think it's all together. And that's why I don't have a problem with LEARN because, you know, we're dealing with a child here. We keep going back. But if they ask the child, if all the child can say is the sky is blue, and the sky happens to be blue, what's, you know, is that child available? And I would say no. Right, because you can't ask her about what's, you know, the basis of the charge. You can't even get to it. I mean, it's like Brandon P. He closed up. He didn't want to talk. He was frightened. But we don't have that particular aspect here, do we? No. And we don't have any, at the time she's testifying, we don't have any apparent duress from anyone, do we? I don't believe so. All right. I would agree with that. Justice Burkett, you made a couple of comments about 115-10.1. So I thought I would like to just comment on that. In 115-10.1, there are no requirements for reliability determinations. But in 115-10, there's two of them. Because we're dealing with a child there. And the reliability in 115-10.1, I believe that comes from that the person made the statement. And that's where the reliability is. And so there's no need to. They're not exactly parallel. But can you say that with a child? I don't think so. Like this adult in, I forget, one of the cases that the State cited was the. . . You know, I don't want to interrupt you. Sure. But reading all these cases, many of these cases involving child testimony, in common sense, and it's a reality that oftentimes children following an initial disclosure recant, say that the statement was a lie. It didn't happen. Does that? I mean, under your reading, and if the Learn Rule apply, that would mean the State could never use those statements in a trial. They would never be able to use those statements, even though the child is technically physically available, will take the stand, will answer questions, and then deny that anything happened and that she lied to the interviewer. So in your analysis, the government, in those cases where there's absolutely rock-solid statement that was not the product of any suggestion, the State could never prosecute the charge. I would say that I would agree with most of that, except for one thing. Only when the only statement against the defendant alleging the acts is that single one testimonial statement. Do you know how often that is the case? I don't know. I know, like, in people's. . . Do you think that there is often physical evidence, corroborative evidence of child sexual abuse in real life? It's very difficult to prosecute. Yeah, there's often. . . It's very difficult. There's no physical evidence, no DNA, no physical trauma. Like in Lowlandes E.G., where, I mean, there was there, and they said that, you know, we understand that this makes it very hard to prosecute, but this is a confrontation, right, that's guaranteed under the Sixth Amendment. And it requires that the witness be available for cross-examination. Right. This is a very difficult case. I agree. I mean, there is very difficult. But I want to make one comment quickly about, I mean, I can't. . . I really did my best to put in my brief everything that could be used as an accusation in her statement to try to really figure it out. And nobody's really come out and said, well, this, this, and this, except maybe for asking the judge during the directed verdict, where she said, well, the first time is the outcry, the second time is the statement to Berg that it happened in January, and the third, because it happened all the time. Well, we don't know what it is. And that second one, because it happened in January. Well, on page 19 of my briefing, this kind of really shows what the problem here. If I may finish. Yes, sir. What the problem is with Berg not using direct, using leading questions to clarify it, because he's getting her to talk about the abuse, and he's clearly talking about it. And he says, when was the last time your daddy did that? And I know that he's referring to that because he just says he was able to establish it. And then right on the next page, and he says, now, I know you said, and then she says, in January. And so then he goes back and he says, now, I know that you said that your daddy cleans your bottom the last time you think was in January. Now he's talking about cleaning her bottom. She may be thinking, oh, now we're back to, he has to clarify that. That's why this is so difficult to follow, because you can't use it in there. And this is John. And why didn't he just go in there and say, I understand that you told your mommy that daddy cleans you with your pee-pee. What is that all about? And he wouldn't have objected to that? Pardon me? He wouldn't have objected to that? There would have been no chance to object, because that should have happened at the interview. But the point, the experts are talking about don't lead, don't suggest. That's a wide-open suggestion. That's a leading question, not to elicit a statement, but to clarify a statement she's already made. So I would say that's a clarification. Well, remember the next time you come up with another one of those. At least I'll try. Okay. And I think that's all I have. Thank you very much. All I would ask for is that this statement here is not enough to support the convictions, so we'd ask for an outright reversal. And if not, remand for a new trial, because this is not over if this goes back for a trial. We don't know what the state's evidence will be when we go back. And in fact, five years from now, if she wakes up and remembers something, she can go to the state's attorney's office, and this could be prosecuted. So instead of asking for an outright conviction for the trial errors, I think that this would have to be remanded for a new trial at that point. All right, thank you both for argument. It was enlightening. We will take the matter under advisement and enter a decision in due course. We're going to stand in a short recess.